Cyrus C. Miller v. Commissioner.
Miller v. Commissioner
Docket No. 40721.
United States Tax Court
T.C. Memo 1954-238; 1954 Tax Ct. Memo LEXIS 4; 13 T.C.M. (CCH) 1185; T.C.M. (RIA) 54344; December 30, 1954, Filed *4 1. Year of worthlessness of corporate stock and corporate debt determined. 2. Worthless debt determined to be non-business in character and deduction limited by section 117(d) of the Internal Revenue Code of 1939. Maurice J. McCarthy, Esq., for the petitioner. James J. Quinn, Esq., for the respondent. ARUNDELL
Memorandum Findings of Fact and Opinion Respondent determined a deficiency of $3,935.98 in the income tax of petitioner for the year 1945. The questions to be decided are whether certain stock and a debt became worthless *5 in 1945, and whether the debt was of a business or a non-business nature. Findings of Fact The petitioner, Cyrus C. Miller, is a resident of the city and state of New York. His Federal income tax return for 1945 was filed with the collector of internal revenue for the third district of New York. Petitioner, an attorney, has been practicing law in the state of New York since 1890. Both petitioner personally and the firm in which he was a partner have tended to specialize in real estate matters. On April 19, 1934, Bernard A. Ruge, a civil engineer, realtor, and real estate developer of many years' standing, entered into a written contract to purchase from Cragston Development Corporation, hereinafter referred to as the Development Corporation, a tract of land consisting of about 731 acres located at Highland Falls, Orange County, New York. The property was contiguous to the United States Military Academy at West Point, New York, and was formerly the estate of J. Pierpont Morgan. The property was partially developed and extended about 3,000 feet along the Hudson River, running back to the mountains about a mile and a half away. The mansion, accessory buildings, cottages, several *6 lakes, and private water and sewerage systems were included in the purchase. In April 1934, Ruge caused to be formed a New York corporation known as Cragston Associates, Inc., hereinafter referred to as Cragston, for the purpose of subdividing the area, selling lots and developing the land. The authorized capital of the corporation was 300 shares of preferred stock with a par value of $100 and 1,000 shares of common stock of no par value. This corporation was recapitalized about June 1935 and the number of authorized shares was increased to 1,000 preferred having a par value of $100 each, and 10,000 common without par value. On May 1, Ruge assigned to Cragston the contract with the Development Corporation for the purchase of the 731 acres of land. The property was subject to a first mortgage of $75,000 held by Merritt Park Estates, Inc., a New Jersey corporation authorized to do business in New York. The purchase price set forth in the contract was $350,000, payable $40,000 within 13 months of the execution of the contract, an additional sum of $50,000 within two years of that date, an additional sum of $60,000 within three years of the contract date, and the balance of $200,000 *7 on or before September 30, 1938. Between August 3 and November 28, 1934, petitioner purchased 50 shares of preferred stock of Cragston for $5,000. Petitioner decided to participate in the project when Ruge consulted with him for the purpose of engaging petitioner's law firm in the preparation of the deeds, restrictions, and sales forms, and in general legal work for the proposed development. The petitioner's firm handled the legal work in connection with the formation and the later capitalization of Cragston. Petitioner drew up various forms of deeds, mortgages and other instruments for use by Cragston Associates in connection with their prospective sales of the property. There were 16 other subscribers to the preferred and common stock of Cragston who paid some $31,400 for their shares between May 1, 1934 and July 1, 1937. In late 1934 or early 1935 about six acres of the property were sold. The average selling price per acre was about $5,000, roughly ten times the average cost per acre. In the latter part of 1935, Cragston first learned that in 1931 Congress had authorized the condemnation of 15,000 acres of land for an addition to the Military Academy at West Point, including *8 the 731 acres covered by the purchase contract. At that time, no appropriation for the condemnation had been made. After learning of this, the officers of Cragston felt ethically compelled to disclose the possible condemnation to potential purchasers, and no further sales of land were made. Ruge immediately began to campaign to get the governmental authorities in Washington to commit themselves on the proposed condemnation. He conferred repeatedly with representatives of the War Department and with members of the Senate and House of Representatives' Appropriations Committees in an effort to determine their intentions. He appeared and testified as to Cragston's problem at numerous hearings of those Committees during the period 1935 through 1939. During the same period, the obligations of Cragston under the land purchase contract and otherwise continued to accrue although no land was being sold. In order to assist the corporation in meeting these obligations, and to protect the company's rights under the purchase contract, petitioner made loans to Cragston as follows: 1934
$ 100.00
1935
31,100.00
1936
28,000.00
1937
16,500.00
1938
3,401.36
1939
597.75
Total
$79,699.11
*9 Each loan was recorded on the books of the corporation. Cragston paid $87,310.70 on the purchase contract between 1934 and 1939. In 1937 or 1938, Federal Housing Authority financing was initially approved for the houses to be built on the development. Shortly thereafter the War Department requested the Federal Housing Authority to withhold its approval of financing of the development on the ground that the War Department was interested in purchasing the tract. In 1937, Congress appropriated $431,000 for the purchase of some of the property covered by the condemnation authorization but these funds were earmarked for acreage other than that covered by Cragston's purchase contract. An appropriation of $1,000,000 was ultimately made and Cragston understood that purchase of its land was then contemplated. After efforts to reach a negotiated purchase of the property by the Army had failed, the United States instituted condemnation proceedings on June 14, 1939, covering 535 of the 731 acres. In May 1943, the court approved the condemnation commission's appraisal and an award of $90,350 was made for the 535 acres of land taken. From this sum, which was paid on or about May 17, 1943, there *10 was disbursed to the County of Orange and Village of Highland Falls for taxes due, and to various lienors the sum of $46,577.32. Nothing was paid to Cragston, the balance of $43,772.68 being paid to Merritt Park Estates, Inc., the mortgagee. Cragston then had remaining property consisting of about 180 acres (the balance having been previously sold) in which the Government manifested no interest. These 180 acres were considerably more valuable, proportionately, than the acreage condemned because of their location along the Hudson River. In November 1943, Merritt Park Estates, Inc., the mortgagee, instituted a foreclosure action against the 180 acres remaining, naming the Development Corporation and Cragston, among others, as defendants, alleging a balance due on principal in the amount of $10,909.73, together with interest, after it had received its share of the proceeds of the condemnation award, and certain other charges, totalling in all $12,576.45. At that time, there also remained owing by Cragston to the Development Corporation approximately $228,916.62 on the contract of purchase. A judgment of foreclosure and sale was issued January 12, 1945, and the property in question *11 was sold by the referee on April 13, 1945, for $1,000 to the plaintiff mortgagee, Merritt Park Estates, Inc. The principals of the Development Corporation and of Merritt Park Estates, Inc., were identical. Cragston had no assets other than the contract for the purchase of the land. Prior to the condemnation proceeding brought by the United States, Cragston had attempted to negotiate a sale to the Government for the approximate price upon which they were liable under the purchase contract in order to get off without a loss. The petitioner took no active part in the management of Cragston nor did he hold any office therein. Throughout the years, petitioner and his law partners occasionally made building loans in connection with real estate developments. Petitioner personally made loans of amounts up to $20,000 prior to the year in question on developments in the Bronx, Greenwich, Connecticut, and elsewhere. It was the experience of petitioner and his partners that when they made loans in connection with real estate developments, the borrowers generally became clients, resulting in increased legal business for petitioner and his partners, and this consideration entered into *12 petitioner's decision to invest and to make the loans. The stock of Cragston Associates, Inc., became worthless in 1945, and the debts owed by Cragston Associates to petitioner also became worthless in 1945. Petitioner was not engaged in the business of regularly making loans on real estate and was not so engaged in 1945. Opinion ARUNDELL, Judge: In his return for 1945, petitioner claimed a deduction of $79,699.11 on the basis of the worthlessness in that year of debts due him from Cragston Associates, Inc. He also reported a loss of $5,000 from the worthlessness of stock in Cragston, claiming a limited capital loss of $1,000. Respondent determined that the worthlessness of both the stock and the debt occurred in a prior year and accordingly disallowed both of the items claimed. As an additional ground for disallowing the bad debt deduction, respondent determined that the debt in question was non-business in nature within the meaning of section 23(k)(4) of the Internal Revenue Code of 1939 and, in any event, deductible only as a short-term capital loss. [1]
*13 We must decide first whether the stock and debt became worthless in 1945, the year before us. It is respondent's contention that Cragston was hopelessly insolvent when the mortgagee instituted foreclosure proceedings in November 1943 against the 180 acres left following the condemnation proceedings. In support of his contention, respondent points to the fact that some three-fourths of the tract had brought only $90,350 in the condemnation sale, leaving only Cragston's rights in 180 acres as compared with $12,576.45 then owing to the mortgagee and $228,916.62 still due on the purchase price. Respondent asserts that in light of these figures there was no possibility of petitioner's ever recovering anything from Cragston after November 1943, either on his loans to the company or his investment in its stock. The evidence, however, is to the contrary. The 180 acres remaining after the condemnation were the choicest part of the entire tract, including some 3,000 feet of frontage along the banks of the Hudson River. The record contains uncontradicted testimony, not only by petitioner but by the experienced realtor, Ruge, that the 180 acres, properly developed, could easily have brought *14 enough to cover all of the corporate obligations, including the amounts due petitioner, and more. We note, also, that the land sold in 1934 and 1935 brought some $5,000 per acre. Sale of the 180 acres at less than one-half that price would have provided ample funds for creditors and stockholders. [2]
The year in which stock becomes worthless is a question of fact requiring consideration of all of the circumstances. Morton v. Commissioner, 112 Fed. (2d) 320. We are convinced that the stock of Cragston Associates, Inc., had value after the institution of the foreclosure action in November 1943 and that the identifiable event marking the worthlessness of the stock was the foreclosure sale of the sole corporate asset in 1945. This leaves for decision the question whether the debt which became worthless in 1945 was a business bad debt, deductible in full under section 23(k)(1), [3] or a non-business bad debt, deductible *15 to a limited extent as provided by section 23(k)(4). [3]
The question before us then is whether the debt was one incurred in petitioner's trade or business. Trade or business is not defined at any point in the Code, but Regulations 111, section 29.23(k)-6, provides *16 in pertinent part: "Sec. 29.23(k)-6. Non-Business Bad Debts. - * * * The question whether a debt is one the loss from the worthlessness of which is incurred in the taxpayer's trade or business is a question of fact in each particular case. The determination of this question is substantially the same as that which is made for the purpose of ascertaining whether a loss from the type of transaction covered by section 23(e) is 'incurred in trade or business' under paragraph (1) of that section. "The character of the debt for this purpose is not controlled by the circumstances attending its creation or its subsequent acquisition by the taxpayer or by the use to which the borrowed funds are put by the recipient, but is to be determined rather by the relation which the loss resulting from the debt's becoming worthless bears to the trade or business of the taxpayer. If that relation is a proximate one in the conduct of the trade or business in which the taxpayer is engaged at the time the debt becomes worthless, the debt is not a non-business debt for the purposes of this section." Whether a debt is a non-business debt within the meaning of section 23(k)(4) so as to fall outside the *17 scope of section 23(k)(1) is a question of fact to be determined from all the circumstances. Robert Cluett, 3rd, 8 T.C. 1178. Petitioner does not contend that he was regularly engaged in the business of lending money and it is quite obvious that he was not so engaged, nor was the firm with which he was connected. Petitioner was a member of a partnership engaged in the active practice of law. It is clear that the various loans totaling $79,699.11 to Cragston Associates, Inc., were not directly connected with petitioner's law practice. The transactions were personal ones of petitioner and it was his money that was being loaned and not funds of the law partnership. But petitioner argues that he expected to secure a substantial amount of legal work as a result of the sale of lots by Cragston and thus he says that the debt in question and the worthlessness of that debt bore a proximate relationship to his practice of law. It may well be that some collateral business at times flows from the contacts one makes from transactions in which he has some financial interest, but this is a far cry from saying that the loss from such an investment would be considered as one "incurred *18 in the trade or business" of petitioner. The financial investment made must bear a much closer relationship to the business in which petitioner is engaged before it can be said that the loss incurred from which such transaction was incurred in petitioner's trade or business, or for that matter was proximately related thereto. We think that the debt that became worthless was a non-business debt within the meaning of the revenue laws and the loss was not one incurred in petitioner's trade or business. It follows that the deduction is limited by section 117(d). It follows that respondent improperly disallowed the limited loss of $1,000 claimed by petitioner resulting from the worthlessness in 1945 of his stock in Cragston. Since the stock did not become worthless in 1943 but retained at least some value until 1945, it is clear that the debt due from Cragston to petitioner also had value until 1945, and that respondent may not base disallowance of the bad debt deduction on worthlessness in a prior year. Decision will be entered under Rule 50. Footnotes
1. Respondent did permit a capital loss carryover of $1,000 for 1945 based on his determination of the worthlessness of the non-business bad debt in a prior year.↩
2. The $1,000 price paid at the foreclosure sale is by no means indicative of the value of the property, since the ownership of the mortgagee corporation and the Development Corporation holding the claim to the balance of the purchase price was identical.↩
3. SEC. 23. DEDUCTIONS FROM GROSS INCOME. In computing net income there shall be allowed as deductions: * * *
(k) Bad Debts. (1) General Rule. - Debts which become worthless within the taxable year; * * * This paragraph shall not apply in the case of a taxpayer, other than a corporation, with respect to a non-business debt, as defined in paragraph (4) of this usbsection. * * *
(4) Non-Business Debts. - In the case of a taxpayer, other than a corporation, if a non-business debt becomes worthless within the taxable year, the loss resulting therefrom shall be considered a loss from the sale or exchange, during the taxable year, of a capital asset held for not more than 6 months. The term "non-business debt" means a debt other than a debt evidenced by a security as defined in paragraph (3) and other than a debt the loss from the worthlessness of which is incurred in the taxpayer's trade or business.↩